# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| HANKOOK TIRE AMERICA CORPORATION, a New Jersey corporation,<br><br>       Plaintiff,<br><br>  v.<br><br>MONZA PERFORMANCE LLC, a California limited liability company, BASHIR HAJJAR, an individual, INNOVATION TIRES AND RIMS LLC, a California limited liability company, and JOHN DOES 1-10,<br><br>       Defendants. | Case No:<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Hankook Tire America Corporation ("Plaintiff" or "Hankook") brings this action against Defendants Monza Performance LLC ("Monza"), Bashir Hajjar ("Hajjar"), Innovation Tires and Rims LLC ("Innovation"), and John Does 1-10 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a)(1)(A); unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); false advertising in violation of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(B); violation of Tennessee's Consumer Protection Act, TN Code § 47-18-104; common law trademark infringement; common law unfair competition; violation of TN Code § 47-50-109; intentional interference with contract; and breach of contract. These claims arise from Defendants' unlawful and unauthorized sale of products bearing Hankook's trademarks on the Internet. In support of its Complaint, Hankook alleges as follows:

## THE PARTIES

1.      Hankook is a corporation organized under the laws of the State of New Jersey, with its principal place of business located in Nashville, Tennessee.

2.      On information and belief, Defendant Innovation is a limited liability company organized under the laws of the State of California.  According to corporate documents filed with the California Secretary of State, the principal place of business of Innovation is located at 10439 Rush Street, South El Monte, California 91733 (the "Rush Street Address"), and Innovation is in the "Automotive" business.  Innovation operates or assists in the operation of an online storefront on www.walmart.com ("Walmart") that is currently called "TIRES AND WHEELS EXPERTS" with Seller ID 101076494 (the "Walmart Storefront").  The Walmart Storefront can be accessed online at http://www.walmart.com/seller/101076494.[1]   Innovation does business throughout the United States through the Walmart Storefront, including in Tennessee.

3.      Bashir Hajjar is a natural person who, upon information and belief, resides at 1320 E. Washington Blvd., Apt. 4, Pasadena, CA 91104 (the "E. Washington Address").  Hajjar operates or assists in the operation of the Walmart Storefront.  Hajjar does business throughout the United States through the Walmart Storefront, including in Tennessee.

4.      The California Secretary of State website and corporate documents that have been filed for Innovation identify Hajjar as the CEO, registered agent, and sole member of Innovation.

---

[1] As of the time of filing, Defendants' Walmart Storefront is named "TIRES AND WHEELS EXPERTS."  Walmart allows storefront operators to change the names of their storefronts, but every storefront on Walmart is assigned a Seller ID that does not change over time even if the formal "name" of a storefront is changed.  The Seller ID for Defendants' Walmart Storefront is identified in Paragraph 2 of this Complaint.  Even if Defendants change the name of their Walmart Storefront at some time in the future, their Walmart Storefront can always be accessed at the link in Paragraph 2 that contains the Seller ID.

Accordingly, upon information and belief, Hajjar is in control of, a principle of, and primarily responsible for the actions of Innovation.

5. The most recent corporate documents for Innovation identify the Rush Street Address as Hajjar's registered agent address.

6. Hankook asserts claims against Hajjar in his individual capacity and also in his capacity as a corporate officer of Innovation. Upon information and belief, Hajjar, in his individual capacity, and Innovation both assist in and are responsible for the operation of the Walmart Storefront.

7. Alternatively, as the CEO and sole member and agent of Innovation, Hajjar directs, controls, ratifies, participates in, or is the moving force behind the unlawful sales of products bearing Hankook's trademarks by Innovation. Accordingly, Hajjar is personally liable for the unlawful activities carried out by Innovation without regard to piercing the corporate veil.

8. Alternatively, upon information and belief, Innovation follows so few corporate formalities and is so dominated by Hajjar that it is merely an alter ego of Innovation. Accordingly, Hankook is entitled to pierce the corporate veil of Innovation and hold Hajjar personally liable for the unlawful activities of Innovation.

9. On information and belief, Defendant Monza is a limited liability company organized under the laws of the State of California. According to corporate documents filed with the California Secretary of State, the principal place of business of Monza is located at 530 South Lake Avenue #216, Pasadena, CA 91101 (the "South Lake Address"), and Monza is in the business of selling automotive tires. Monza operates or assists in the operation of the Walmart Storefront. Monza does business throughout the United States through the Walmart Storefront, including in Tennessee.

3

10.    A UCC Financing Statement filed against Monza identifies Monza and Hajjar as co-debtors, both located at the E. Washington Address.

11.    The Walmart Storefront currently lists "monza performance llc" as its business name and the South Lake Address as its business address, as shown in the screenshot below:



12.    Previously, the Walmart Storefront did not identify a business name and listed the E. Washington Address as its business address, as shown in the screenshot below:



13.     Both Monza and Innovation have identified the E. Washington Address as its business address in corporate documents.

14.     The corporate documents that have been filed for Monza identify "Thomas Crown" as the sole member of Monza.

15.     Hankook investigated the operators of the Walmart Storefront and could not confirm that anyone named "Thomas Crown" has resided at or otherwise been connected with the Rush Street, E. Washington, or South Lake Addresses.

16.     Accordingly, based on the UCC filing by Hajjar, Hankook's investigation of the Walmart Storefront, and Hankook's communications with Hajjar, as further alleged in this Complaint, Hankook believes "Thomas Crown" is not a real person and is an alter ego for Hajjar.

17.     Accordingly, upon information and belief, Hajjar is in control of, a principle of, and primarily responsible for the actions of Monza.

18.     Hankook asserts claims against Hajjar in his individual capacity and also in his capacity as a corporate officer of Monza.  Upon information and belief, Hajjar, in his individual capacity, and Monza both assist in and are responsible for the operation of the Walmart Storefront.

19.     Alternatively, as the sole member of Monza, Hajjar directs, controls, ratifies, participates in, or is the moving force behind the unlawful sales of products bearing Hankook's trademarks by Monza.  Accordingly, Hajjar is personally liable for the unlawful activities carried out by Monza without regard to piercing the corporate veil.

20.     Alternatively, upon information and belief, Monza follows so few corporate formalities and is so dominated by Hajjar that it is merely an alter ego of Hajjar.  Accordingly, Hankook is entitled to pierce the corporate veil of Monza and hold Hajjar personally liable for the unlawful activities of Monza.

5

21.     Defendants are acting in concert as part of a coordinated scheme to sell products bearing Hankook's trademarks without authorization through the Walmart Storefront. Defendants are jointly responsible for the conduct complained of herein.

22.     The true names, involvement and capacities, whether individual, corporate, associated or otherwise, of defendants Does 1 through 10 (the "Doe Defendants") are unknown to Hankook. Therefore, Hankook sues these defendants by a fictitious name. Hankook is informed and believes, and on that basis alleges, that each of the Doe Defendants sued herein is responsible in some manner for the events and occurrences referred to herein or otherwise interested in the outcome of this dispute. When the true names, involvement and capacities of these parties are ascertained, Hankook will seek leave to amend this complaint accordingly. The Doe Defendants are unknown natural persons and/or corporations/business entities that unlawfully acquired, distributed, or sold Hankook products.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Hankook's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Tennessee are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

24.     This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of doing business in Tennessee, including advertising and selling infringing products in Tennessee and shipping products to Tennessee, and have directed their tortious activities toward Tennessee by infringing Hankook's trademarks with

the knowledge that their actions would likely injure Hankook in Tennessee, such that Defendants could reasonably expect to be haled into court in Tennessee.

25. Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS
### Hankook and Its Trademarks

26. Hankook distributes specialty tires for passenger cars, electronic vehicles, SUVs, light trucks, and other specialty vehicles.

27. Hankook allows products sold under the Hankook and Laufenn brands (referenced hereinafter as "Hankook products") to be sold to end-user consumers in the United States only by retailers and commercial dealers who Hankook has expressly authorized to sell Hankook products ("Authorized Sellers").

28. Hankook allows Authorized Sellers to sell Hankook products only in approved channels and requires all Authorized Sellers to agree to maintain the quality of Hankook products by adhering to product storage, handling, sales channel restrictions, and other quality controls and applicable standards, as set forth in Hankook's Authorized Seller Policy and related terms and conditions (the "Hankook Terms").

29. Hankook's Authorized Sellers must purchase Hankook products from Hankook itself or from distributors authorized by Hankook to sell Hankook products to Authorized Sellers for retail sale ("Authorized Distributors"). Authorized Distributors must also adhere to the Hankook Terms.

30. Hankook provides to a subset of its Authorized Sellers certain marketing, promotion, and related services ("Hankook ONE Dealers") for their sales of Hankook products.

Hankook's Hankook ONE Dealers enter into contracts with Hankook that require them to abide by the standards and terms in the Hankook Terms, as well as additional terms (collectively, the "ONE Dealer Contracts"). Hankook's Hankook ONE Dealers are bound by both the Hankook Terms and the ONE Dealer Contracts.

31.     Hankook devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation. By selling its products exclusively through Authorized Sellers, Hankook is able to ensure the safety, well-being, and satisfaction of consumers, and maintain the integrity and reputation of Hankook products and the Hankook and Laufenn brands. In the highly competitive tire market, quality, safety, and customer service are a fundamental part of a consumer's decision to purchase a product.

32.     To promote and protect the Hankook and Laufenn brands, Hankook has secured the rights to numerous trademarks registered with the United States Patent and Trademark Office, including but not limited to: HANKOOK® (U.S. Trademark Registration Nos. 1,122,303 and 2,999,124); E HANKOOK® (U.S. Trademark Registration No. 6,344,498); LAUFENN® (U.S. Trademark Registration No. 4,694,469); VENTUS EVO® (U.S. Trademark Registration No. 3,761,435); and VANTRA® (U.S. Trademark Registration No. 4,103,834) (collectively, the "Hankook Trademarks").

33.     The registration for each of the Hankook Trademarks is valid, subsisting, and in full force and effect.

34.     Hankook actively uses, advertises, and markets the Hankook Trademarks in commerce.

35.     Consumers recognize the Hankook Trademarks as being associated with high-quality tires.

36. Due to the quality and exclusive distribution of Hankook's products, and because Hankook is recognized as the source of high-quality products, the Hankook Trademarks have enormous value.

**Online Marketplaces and the Challenges They Present to Hankook Product Quality and Goodwill**

37. E-commerce retail sales have exploded over the past decade. From 2009 through the end of 2024, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 16.4%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 19, 2025), https://fred.stlouisfed.org/series/ECOMPCTSA.

38. In 2024, consumers spent $1.192 trillion on e-commerce sales, a 7.5% increase from 2023. *See* Abbas Haleem, *US ecommerce sales in 2024 more than double those of 2019*, Digital Commerce 360 (Mar. 3, 2025), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2024 United States consumers spent more than $500 billion in e-commerce sales on Amazon and Walmart.

39. Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

40. Unlike when purchasing products at a brick-and-mortar store or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the brand owner.

41.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

42.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

43.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-

commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

44.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

45.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no way to exercise their quality controls over products sold by unauthorized sellers or ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers.

46. The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

47. When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer or brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

48. For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

49. When a customer purchases on a marketplace and receives a product that is damaged, defective, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

50. Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

51.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

52.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 42% of online consumers now trust online reviews as much as personal recommendations from friends and family.  Sammy Paget, *Local Consumer Review Survey 2025*, BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

53.     Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% of consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-

Reviews.pdf. As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

54. Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Hankook's Reputation and Goodwill Have Been Harmed by Numerous Online Reviews Written by Consumers Who Purchased Poor-Quality Products from Unauthorized Sellers on Online Marketplaces**

55. Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing. These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

56. For example, Defendants have sold on Walmart the Hankook product seen in the screenshot below:



57. As seen in the following sample screenshot of customer reviews, consumers have left negative reviews complaining about receiving products that were old and of poor quality from

Defendants.  Additionally, consumers have left negative reviews of customer service related to the above product:







58.     Defendants have additionally listed the below Hankook product on the Walmart Storefront:



59.     As seen in the following sample screenshots, consumers have left negative reviews of this product, complaining about receiving products that were old, defective, incomplete, or otherwise different from expected from Defendants.  Consumers also complained about receiving poor customer service:







Jul 31, 2024 ★☆☆☆☆ **Verified Purchase** ⓘ

🔍 **sam**

**Sold by**
TIRES AND WHEELS EXPERTS

The date of manufacture close to 2 yrs a go

Helpful? 👍 (0)  👎 (0)  |  Report



Oct 18, 2023 ★☆☆☆☆ **Verified Purchase** ⓘ

🔍 **Bendix20**

**Sold by**
TIRES AND WHEELS EXPERTS

**Total failure on customer service**

I bought four of these tires. When mounted two were defective and had to be replaced. I called the seller and they said to bad call Walmart not our problem. I called Walmart and basically was told to buy two more tires and they would refund me for the two bad ones. I explained the tires were going to cost me $20 more plus tax then I paid and Walmart said to bad. I asked who was going to pay for taking them off and remounting them? Walmart said to bad. By this time my vehicle had been down almost a week due to this issue. Again to bad not our problem. I couldn't take a chance on more bad tires so I purchased them for another supplier, they came from Delaware not California and those tires were fine. All in all I lost a week of use with my vehicle, I lost money buying replacement tires and I lost money paying the installer to do it twice. I am never buying tires from Walmart again, they totally let me the customer down. They did take the two defective tires and issued a refund but it required me picking them up and taking them over to our local Walmart. At least the people there were good.

Read less

Helpful? 👍 (3)  👎 (0)  |  Report



Sep 22, 2023 ★☆☆☆☆ **Verified Purchase** ⓘ

🔍 **William**

**Sold by**
TIRES AND WHEELS EXPERTS

**No whitewall**

I thought it was a white wall and it is not. Can i return it. Still got stickers and never mounted.

Helpful? 👍 (1)  👎 (3)  |  Report

60.     Defendants have additionally listed the below Hankook product on the Walmart storefront:

17



61.     Consumers have complained of receiving uneven tires from Defendants:



62.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Hankook products that Defendants have sold through their Walmart Storefront.

**Hankook Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented by Online Marketplaces, Protect the Value**

**of the Hankook Trademarks, and Ensure Customers Receive the Genuine, High-Quality Products They Expect from Hankook**

63.     The above reviews show how sales of poor-quality Hankook products disappoint Hankook's consumers and cause significant harm to the reputation and goodwill of Hankook and its brands.  To protect itself and consumers from these harms, Hankook implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

64.     Hankook's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Hankook Trademarks by unauthorized sellers like Defendants who do not abide by Hankook's quality controls.  The goal of Hankook's quality control program is to ensure that consumers who buy Hankook products, including ones buying online, receive the high-quality products and services that they expect with the Hankook name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Hankook brand.

65.     Hankook requires its Authorized Sellers to abide by its quality control requirements.

66.     Hankook's ability to exercise its quality controls is essential to the integrity and quality of Hankook's products, as well as the value of the Hankook Trademarks and other intellectual property.

67.     Hankook's quality controls begin with requiring that all sales of Hankook products to end-user consumers take place through Hankook's Authorized Sellers.  This basic step ensures that everyone who is selling Hankook products is ultimately subject to Hankook's quality control requirements.

68.     The Hankook Terms limit to whom and where Authorized Sellers may sell Hankook products.  To prevent persons outside of Hankook's quality controls from acquiring and reselling Hankook's products, the Hankook Terms prohibit Authorized Sellers from selling Hankook products to any third party who intends to resell the products.  Authorized Sellers are permitted to sell Hankook products only to end-user consumers.

69.     Authorized Sellers are also prohibited from selling Hankook products on any website unless they first obtain written consent from Hankook.

70.     These restrictions are essential to Hankook's ability to exercise its quality controls over Hankook products because they prevent unauthorized sellers from obtaining and reselling Hankook products and allow Hankook to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Hankook can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Hankook is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

71.     In addition to restricting where and how Authorized Sellers can sell Hankook products, the Hankook Terms also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Hankook products.

72.     To ensure that customers receive the genuine and high-quality products they expect from Hankook, the Hankook Terms require Authorized Sellers to inspect all Hankook products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Authorized Sellers are prohibited from selling damaged or defective

products.  Further, to assist Hankook in identifying any product quality issues, Authorized Sellers are required to report any defects to Hankook.

73.     The Hankook Terms also require that Authorized Sellers store Hankook products in accordance with instructions issued by Hankook.  This requirement helps ensure that Hankook products are stored properly and are not damaged prior to being shipped to the consumer.

74.     To avoid consumer confusion and ensure that customers receive genuine Hankook products, Authorized Sellers must sell Hankook products in their original packaging and are prohibited from relabeling, repackaging, or altering Hankook products or any accompanying label, literature, or safety-related information, unless instructed by Hankook.

75.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Hankook products, including any serial number, UPC code, DOT code, or other identifying information.

76.     Authorized Sellers are prohibited from advertising or selling as "new" any Hankook product that has been returned subsequent to installation or use.

77.     Authorized Sellers must use images of Hankook products provided or approved by Hankook and keep product descriptions up to date.

78.     The Hankook Terms give Hankook the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Hankook products, to ensure their compliance with Hankook quality control requirements.  Authorized Sellers also must cooperate with Hankook with respect to any product recall or other consumer safety information dissemination effort conducted by Hankook regarding Hankook products.

79.     Authorized Sellers must ensure that any fulfillment or storage service is aware of and complies with Hankook's quality control and customer service requirements and stores all

Hankook products segregated by seller to ensure no Hankook products are commingled with products owned by any third party. This requirement ensures that the specific products that the Authorized Seller has that meet Hankook's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Hankook quality controls.

80.     The Hankook Terms also require Authorized Sellers to provide various customer services to their customers.

81.     For example, Authorized Sellers must familiarize themselves with the features of all Hankook products kept in their inventory so that they can advise customers on the selection and safe use of Hankook products. Following the sale of genuine Hankook products, Authorized Sellers must provide ongoing support to consumers and prompt replies to their inquiries.

82.     Hankook's quality control and customer service requirements are legitimate and substantial and have been implemented so that Hankook can control the quality of goods manufactured and sold under the Hankook Trademarks, to protect consumers as well as the value and goodwill associated with the Hankook Trademarks.

83.     Hankook's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality and unsafe products. Consumers would find it material and relevant to their purchasing decision to know whether a Hankook product that they were considering buying was being sold by an Authorized Seller who is subject to Hankook's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Hankook's quality controls and over whom Hankook is unable to exercise its quality controls.

**Hankook Monitors and Audits Its Authorized Sellers to Ensure They Comply with Its Quality Control Requirements**

84. Hankook regularly audits its Authorized Sellers to ensure that Authorized Sellers are adhering to Hankook's quality control requirements. Hankook carries out its auditing and monitoring actions pursuant to Hankook's internal online quality control program ("Auditing Program").

85. As part of its Auditing Program, Hankook regularly examines Authorized Sellers' websites to ensure that Authorized Sellers who sell Hankook products online are complying with the Hankook Terms. During these examinations, Hankook monitors online reviews of Hankook products and Authorized Sellers to identify consumer complaints regarding product quality or customer service. If Hankook discovers negative reviews, Hankook communicates with the responsible Authorized Sellers to determine the cause(s) of the negative reviews and take corrective action.

86. Hankook additionally conducts test purchases of Hankook products from its Authorized Sellers to test for any product quality issues and assess customer service practices. If Hankook discovers any quality problems in purchased products or discovers that an Authorized Seller is otherwise not following Hankook's quality control and customer service requirements— for example, by altering product packaging or advertising previously used products as "new"— Hankook communicates with the responsible Authorized Seller and takes any necessary corrective action.

87. If Hankook discovers that an Authorized Seller is selling Hankook products of poor quality or otherwise not adhering to Hankook's quality control or customer service requirements, Hankook conducts an investigation to determine the source of the problem. The Hankook Terms require that Authorized Sellers cooperate with Hankook's investigation and permit Hankook to

23

inspect their facilities and records relating to Hankook products. Based on what its investigation reveals, Hankook has the right suspend or terminate an Authorized Seller's status as an Authorized Seller of Hankook products.

### Defendants Are Not Authorized Sellers and Are Illegally Selling Products Bearing the Hankook Trademarks

88.  Because the unauthorized sale of Hankook products on the Internet threatens the reputation and goodwill associated with the Hankook Trademarks, Hankook actively monitors the sale of its products online.

89.  In the course of this monitoring, Hankook discovered that high volumes of products bearing the Hankook Trademarks were being illegally sold through the Walmart Storefront. Through investigation, Hankook identified Defendants as the operators of the Walmart Storefront and as the parties who are responsible for the unlawful sale of products bearing the Hankook Trademarks through the Walmart Storefront.

90.  Defendants Monza and Hajjar are not, and have never been, authorized to sell Hankook products.

91.  Defendant Innovation used to be a Hankook ONE Dealer of Hankook products.

92.  On October 1, 2022, Innovation entered into a ONE Dealer Contract with Hankook.

93.  Innovation's ONE Dealer Contract with Hankook required Innovation to comply with both the Hankook Terms and the ONE Dealer Contract.

94.  Hankook's ONE Dealer Contract with Innovation prohibited Innovation from selling Hankook products on any website or online marketplace, including Walmart, without prior authorization from Hankook. Hankook never authorized Innovation or any of the other Defendants to sell Hankook products on the Walmart Storefront.

95.     While Innovation was a Hankook ONE Dealer, it was reselling Hankook products to Monza and Hajjar, in breach of its ONE Dealer Contract with Hankook.

96.     Upon discovering Innovation's connection to the Walmart Storefront, counsel for Hankook sent Defendants a cease-and-desist letter on or about October 3, 2024 to the Rush Street Address and electronically to tiresandwheelsexperts@gmail.com (the "Tires and Wheels Email") and bashirh@innovationtires.com ("Bashir's Email").  This letter reminded Defendants that Authorized Sellers are prohibited from selling Hankook products through online storefronts without Hankook's prior written consent and requested Defendants to cease their advertising and sale of Hankook products on any online marketplace, including the Walmart Storefront.

97.     Defendants did not respond to this letter and continued to offer for sale Hankook products through the Walmart Storefront.

98.     On November 4, 2024, Hankook terminated Innovation's status as a Hankook ONE Dealer and cut off Innovation's known sourcing of Hankook products.

99.     After this termination, Defendants briefly removed their listings of Hankook products, but soon relisted.

100.    On or about November 27, 2024, Hankook, through counsel, sent a second cease-and-desist letter to Defendants at the Rush Street Address and electronically to the Tires and Wheels Email and Bashir's Email.  The letter explained, among other things, that Defendants' sales infringed on the Hankook Trademarks and tortiously interfered with Hankook's contracts by purchasing products from Authorized Sellers.  Hankook's letter demanded that the operators permanently cease selling products bearing the Hankook Trademarks on their Walmart Storefront and any other unauthorized website and disclose every person and entity that provided them with the products they have sold.  Defendants did not respond to this letter.

101.     On or about February 28, 2025, Hankook, through counsel, sent a third cease-and-desist letter to Defendants at the Rush Street Address, Tires and Wheels Email, and Bashir's Email. This letter reiterated the claims in the second cease-and-desist letter and put Defendants on notice of anticipated litigation.  Defendants did not respond to this letter.

102.     On April 29, 2025, Hankook, through counsel, sent a fourth cease-and-desist letter, with a draft lawsuit enclosed, to Defendants at the Rush Street Address, Tires and Wheels Email, and Bashir's Email.  The letter served as a final notice that Defendants must comply with the demands in the prior cease-and-desist letters to avoid litigation.  Defendants did not respond to this letter.

103.     Defendants, without authorization from Hankook, have sold—and are currently selling—products bearing the Hankook Trademarks on the Walmart Storefront.

104.     Defendants are selling Hankook products without authorization and in violation of Hankook's intellectual property rights under federal and Tennessee law.  Defendants are not currently Hankook ONE Dealers.

**Defendants Are Engaging in False Advertising by Falsely Stating That They Are Authorized Dealers of Hankook Products**

105.    As of the date of filing this Complaint, on their Walmart Storefront, Defendants falsely state that they are "authorized dealer[s]" of Hankook products, as shown below:



**About TIRES AND WHEELS EXPERTS**                                          ✕

ⓘ This seller may also engage in manufacturing, importing or reselling consumer products.

🏬  monza performance llc

📍  530 south lake ave, PASADENA, CA 91101

✉  Contact seller    📞  (626) 489-0816

WE ARE AUTHORIZED DEALER FOR THE MOST TIRES AND WHEELS BRANDS , FOR ALL KIND PASSENGER VEHICLES

106.    Defendants' misrepresentation that they are "authorized dealer[s]" of Hankook products is false because none of Defendants are Authorized Sellers of Hankook products.

107.    Defendant Innovation was previously a Hankook ONE Dealer, but Hankook terminated Innovation's ONE Dealer Contract and Hankook ONE Dealer status on November 4, 2024.

108.    Defendants Monza and Hajjar have never been Authorized Sellers of Hankook products.

109.    Defendants have known since November 4, 2024, at the latest, when Innovation was terminated as a Hankook ONE Dealer, that they have been falsely advertising the products they sell.

110.    Defendants' misrepresentation that they are "authorized dealer[s]" of Hankook products is material because whether a seller is authorized is a material component of a consumer's purchasing decision.   Because tires are a significant expense and implicate safety concerns,

consumers are more likely to purchase Hankook products from sellers who are authorized to sell them and required to abide by Hankook's quality controls and customer service requirements.

111.    Defendants' misrepresentation is likely to, and does, create consumer confusion because customers who purchase Hankook products from Defendants believe they are purchasing products from Authorized Sellers of Hankook products when, in fact, they are not.

112.    Customers have written numerous reviews of Defendants' Walmart Storefront in which they complained about receiving poor customer service and products that were defective, incomplete, or otherwise different from expected:







| Oct 18, 2023 | ★☆☆☆☆ |
| --- | --- |
| Bendix20 | I had an issue with defective tires, the seller told me tough go to Walmart not our problem. Very poor customer service. |
| **Item bought** Hankook Kinergy ST (H735) All Season 215/70R16 100T... | |

| Feb 23, 2022 | ★☆☆☆☆ |
| --- | --- |
| Gordon | Gentlemen called me from Tires and Wheel Experts. Spoke to me in a very demeaning manner. Asked what was wrong with me. Unprofessional and unacceptable. While writing this review, the Seller called me and spoke to me in a very demeaning manner. Asking if "I was serious", "what was I thinking" and so on. He used the scenario "when you see clothes on a mannequin do you expect to receive the mannequin with the clothes" He explained he has NO CONTROL over the pictures Walmart puts up. This wasn't their fault, it was Walmart who is misleading. He said he'd send shipping labels for me to return the tires AFTER I EXPLAINED I NEEDED THEM and I would have to buy rims separately. Very rude and spoke over me several times. WOW CUSTOMER SERVICE Very disappointed that Walmart would do business with a vendor who has these practices. |
| | Read less |

113. These reviews are only some of the negative reviews that customers have written about Defendants and their Walmart Storefront. A significant reason why Hankook allows Hankook products to be sold only by Authorized Sellers who are subject to Hankook's quality controls and prohibit Authorized Sellers from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the negative reviews of Defendants' Walmart Storefront.

114. Through their misrepresentation on their Walmart Storefront, Defendants have misled—and continue to mislead—consumers into believing they are purchasing Hankook products from Authorized Sellers.

**Hankook Has Suffered Substantial Harm**

115. As set forth above, the unauthorized sale of products bearing the Hankook Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Hankook and Laufenn brands.

116.     When a consumer receives a damaged or otherwise poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Hankook.  This harm is exacerbated when the unauthorized seller falsely states to consumers that it is an authorized dealer of Hankook products, as Defendants have done on their Walmart Storefront.

117.     As such, Defendants' ongoing sale of products bearing the Hankook Trademarks and misrepresentation that Defendants are authorized dealers of Hankook products harms Hankook and its brands.

118.     As a proximate result of Defendants' actions, Hankook has suffered, and will continue to suffer, irreparable harm to its quality control procedures, the Hankook Trademarks, and its goodwill.

119.     Defendants' conduct was knowing, intentional, willful, malicious, wanton, and contrary to law.

120.     Hankook is entitled to injunctive relief because Defendants will continue to unlawfully sell Hankook products and misrepresent themselves to consumers as authorized dealers of Hankook products.  Defendants' ongoing illegal conduct has caused, and will continue to cause, irreparable harm to Hankook's goodwill, and has caused, and will continue to cause, Hankook and its Authorized Sellers to lose business.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

121.     Hankook hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

122.     Hankook has secured the rights to the Hankook Trademarks.

123.    The Hankook Trademarks are registered with the United States Patent and Trademark Office.

124.    The Hankook Trademarks are valid and subsisting trademarks in full force and effect.

125.    Defendants willfully and knowingly used, and continue to use, the Hankook Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Hankook Trademarks on the Internet without Hankook's consent.

126.    The products Defendants sell bearing the Hankook Trademarks are not authorized for sale by Hankook.

127.    The products Defendants sell bearing the Hankook Trademarks are materially different from genuine Hankook products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Hankook has established.

128.    Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Hankook products when they are not.

129.    Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Hankook when, in fact, they are not.

130.    Defendants' unauthorized use of the Hankook Trademarks has infringed upon and materially damaged the value of the Hankook Trademarks and caused significant damage to Hankook's business relationships.

131.    As a proximate result of Defendants' actions, Hankook has suffered, and will continue to suffer, immediate and irreparable harm.  Hankook has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

132.    Hankook is entitled to recover its damages caused by Defendants' infringement of the Hankook Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

133.    Hankook is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Hankook will suffer irreparable harm.

134.    Hankook is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Hankook Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

135.    Hankook hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.    As set forth above, Defendants are selling non-genuine products bearing the Hankook Trademarks that are materially different from genuine Hankook products.

137.    Defendants' sale of non-genuine products bearing the Hankook Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Hankook when they are not.

138.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

139.    Hankook is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Hankook will suffer irreparable harm.

140.    Hankook is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Hankook Trademarks.

### THIRD CAUSE OF ACTION
**False Advertising**
**15 U.S.C. § 1125(a)(1)(B)**

141.    Hankook re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

142.    Hankook has acquired the rights to the Hankook Trademarks.

143.    The Hankook Trademarks are registered with the United States Patent and Trademark Office.

144.    The Hankook Trademarks are valid and subsisting trademarks in full force and effect.

145.    Through their Walmart Storefront, Defendants willfully and knowingly used, and continue to use, the Hankook Trademarks in commerce for the purpose of advertising, promoting, and selling Hankook products without Hankook's consent.

146.    In connection with their sale of Hankook products without Hankook's consent, Defendants make false and misleading statements that they are authorized to sell Hankook products.

147.    Defendants' false and misleading statements have been disseminated to the relevant purchasing public.

148.    Defendants falsely advertise the products they sell, including, but not limited to, falsely advertising that Defendants are authorized to sell Hankook products.

149.    As of the date of filing this Complaint, Defendants continue to advertise and sell Hankook products without authorization from Hankook, and continue to misrepresent that they are "authorized dealer[s]" of Hankook products.

150.    Defendants' representation that they are "authorized dealer[s]" of Hankook products is false because none of Defendants are currently Authorized Sellers or Hankook ONE Dealers of Hankook products.

151.    Defendant Innovation was previously a Hankook ONE Dealer but Hankook terminated Innovation's ONE Dealer Contract and Hankook ONE Dealer status on November 4, 2024.

152.    Defendants Monza and Hajjar have never been Authorized Sellers or Hankook ONE Dealers of Hankook products.

153.    Defendants have known since November 4, 2024, at the latest, when Innovation was terminated as a Hankook ONE Dealer, that they have been falsely advertising the products they sell.

154.    Defendants' misrepresentation that they are "authorized dealer[s]" of Hankook products is likely to deceive a substantial portion of Defendants' intended audience—customers who purchase products on the Walmart Storefront—because, at minimum, Defendants boast themselves as being authorized dealers of tire products in an effort to attract consumers, and make the misrepresentation conspicuously in the "About Seller" section of its Walmart Storefront page.

155.    Defendants' misrepresentation that they are "authorized dealer[s]" is material because whether a seller is authorized is a material component of a consumer's purchasing

decision. Because tires are a significant expense and implicate safety concerns, consumers are more likely to purchase Hankook products from sellers who are authorized to sell them and required to abide by Hankook's quality controls and customer service requirements.

156. Defendants' misrepresentation is likely to cause Hankook to lose sales in part because Defendants' sale of poor-quality products and provision of poor customer service harms Hankook's reputation and customer goodwill.

157. Defendants' misrepresentation is also likely to cause Hankook to lose sales because consumers will be influenced to buy Hankook products from Defendants instead of Hankook's Authorized Sellers.

158. As a proximate result of Defendants' actions, Hankook has suffered, and will continue to suffer, damages to its business, goodwill, reputation, and profits in an amount to be proven at trial.

159. Hankook is entitled to recover its damages caused by Defendants' false advertising and disgorge Defendants' profits from any sales garnered from their willfully false statements and unjust enrichment.

160. Hankook is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Hankook will suffer irreparable harm.

161. Hankook is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false advertising.

### FOURTH CAUSE OF ACTION
**Tennessee Consumer Protection Act**
**TN Code § 47-18-104**

162. Hankook hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

163. Hankook has acquired the rights to the Hankook Trademarks, which are distinctive and widely recognized marks by the consuming public. Products bearing the Hankook Trademarks are sold by Hankook's Authorized Sellers throughout the United States, including Tennessee.

164. Hankook is widely recognized as the designated source of goods bearing the Hankook Trademarks.

165. In the course of their business, vocation, or occupation, Defendants sold products bearing the Hankook Trademarks without Hankook's authorization. The products sold by Defendants were materially different from genuine Hankook's products because, among other reasons, the products sold by Defendants were not subject to Hankook's other quality control procedures.

166. In selling products bearing the Hankook Trademarks that were not, in fact, genuine and authentic Hankook products, Defendants have caused a likelihood of confusion and/or misunderstanding as to the source, sponsorship, or approval of the products because consumers are likely to believe that the products sold by Defendants are sourced from, sponsored, and/or approved by Hankook.

167. Defendants' deceptive trade practices have affected the conduct of commerce for Hankook products because Defendants' conduct has damaged Hankook's business, goodwill, and reputation as well as Authorized Sellers' business.

168. Defendants' deceptive trade practices have caused and will continue to cause Hankook irreparable harm. Hankook is entitled to judgment enjoining and restraining Defendants from engaging in further deceptive practices.

169.     The acts of the Defendants were willful, malicious, oppressive, and undertaken with the conscious intent to deprive Hankook of its rights and property, thereby entitling Hankook to treble damages in addition to all other damages sustained thereby.

**FIFTH CAUSE OF ACTION**
**Common Law Trademark Infringement**

170.     Hankook hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.     This claim arises under the laws of the State of Tennessee.

172.     Hankook has secured the rights to the Hankook Trademarks.

173.     The Hankook Trademarks are registered with the United States Patent and Trademark Office.

174.     The Hankook Trademarks are valid and subsisting trademarks in full force and effect.

175.     The Hankook Trademarks are distinctive and widely recognized marks by the consuming public.

176.     Hankook is widely recognized as the designated source of goods bearing the Hankook Trademarks.

177.     Defendants willfully and knowingly used, and continue to use, the Hankook Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Hankook Trademarks on the Internet without Hankook's consent.

178.     The products Defendants sell bearing the Hankook Trademarks are not authorized for sale by Hankook.

179.    The products Defendants sell bearing the Hankook Trademarks are materially different from genuine Hankook products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Hankook has established.

180.    Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Hankook products when they are not.

181.    Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Hankook when, in fact, they are not.

182.    Defendants' unauthorized use of the Hankook Trademarks has infringed upon and materially damaged the value of the Hankook Trademarks and caused significant damage to Hankook's business relationships.

183.    As a proximate result of Defendants' actions, Hankook has suffered, and will continue to suffer, immediate and irreparable harm.  Hankook has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

184.    As a result, Hankook has suffered damages and Hankook is entitled to recover its damages, including, but not limited to, loss of sales and a loss of goodwill associated with its trademarks and products.

### <u>SIXTH CAUSE OF ACTION</u>
### Common Law Unfair Competition

185.    Hankook hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

186. This claim arises under the laws of the State of Tennessee.

187. Hankook has secured the rights to the Hankook Trademarks.

188. The Hankook Trademarks are registered with the United States Patent and Trademark Office.

189. The Hankook Trademarks are valid and subsisting trademarks in full force and effect.

190. Defendants willfully and knowingly used, and continue to use, the Hankook Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Hankook Trademarks on the Internet without Hankook's consent.

191. The products Defendants sell bearing the Hankook Trademarks are not authorized for sale by Hankook.

192. The products Defendants sell bearing the Hankook Trademarks are materially different from genuine Hankook products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Hankook has established.

193. Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Hankook products when they are not.

194. Defendants' unauthorized sale of materially different products bearing the Hankook Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Hankook when, in fact, they are not.

195. Defendants' unauthorized use of the Hankook Trademarks has infringed upon and materially damaged the value of the Hankook Trademarks and caused significant damage to Hankook's business relationships.

196. In connection with their sale of Hankook products without Hankook's consent, Defendants make false and misleading statements that they are authorized to sell Hankook products.

197. Defendants' false and misleading statements have been disseminated to the relevant purchasing public.

198. Defendants falsely advertise the products they sell, including, but not limited to, falsely advertising that Defendants are authorized to sell Hankook products.

199. As of the date of filing this Complaint, Defendants continue to advertise and sell Hankook products without authorization from Hankook, and continue to misrepresent that they are "authorized dealer[s]" of Hankook products.

200. Defendants' representation that they are "authorized dealer[s]" of Hankook products is false because none of Defendants are currently Authorized Sellers or Hankook ONE Dealers of Hankook products.

201. Defendant Innovation was previously a Hankook ONE Dealer but Hankook terminated Innovation's ONE Dealer Contract and Hankook ONE Dealer status on November 4, 2024.

202. Defendants Monza and Hajjar have never been Authorized Sellers or Hankook ONE Dealers of Hankook products.

203. Defendants have known since November 4, 2024, at the latest, when Innovation was terminated as a Hankook ONE Dealer, that they have been falsely advertising the products they sell.

204. Defendants' misrepresentation that they are "authorized dealer[s]" of Hankook products is likely to deceive a substantial portion of Defendants' intended audience—customers who purchase products on the Walmart Storefront—because, at minimum, Defendants boast themselves as being authorized dealers of tire products in an effort to attract consumers, and make the misrepresentation conspicuously in the "About Seller" section of its Walmart Storefront page.

205. Defendants' misrepresentation that they are "authorized dealer[s]" is material because whether a seller is authorized is a material component of a consumer's purchasing decision. Because tires are a significant expense and implicate safety concerns, consumers are more likely to purchase Hankook products from sellers who are authorized to sell them and required to abide by Hankook's quality controls and customer service requirements.

206. Hankook has valid contracts and business relationships with its Hankook ONE Dealers, who sell Hankook products to end-user consumers. These contracts prohibit Hankook ONE Dealers from selling Hankook products to third parties, such as Defendants Monza and Hajjar, who are not end-user consumers.

207. Defendants Monza and Hajjar are not, and have never been, Hankook ONE Dealers.

208. Monza and Hajjar have sold—and continue to sell—a high volume of products bearing the Hankook Trademarks through their Walmart Storefront.

209. Monza and Hajjar have known since, at the latest, receiving Hankook's November 27, 2024, cease-and-desist letter that Hankook has agreements with its Authorized Sellers that prohibit them from selling Hankook products to third-parties who intend to resell products, and

that Monza and Hajjar would tortiously interfere with those agreements if they continued to acquire products from Authorized Sellers for resale.

210. Monza and Hajjar, despite having knowledge of this prohibition and without legal right, privilege, or justification, have maliciously, intentionally, knowingly, and willfully interfered with the agreements and business relationships between Hankook and its Authorized Sellers, without justification, by purchasing products from Authorized Sellers for the purpose of reselling them on the Internet, thereby causing Authorized Sellers to breach their agreements with Hankook.

211. Upon information and belief, Monza and Hajjar interfered with Hankook's agreements with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with Hankook by selling to these Defendants.

212. Innovation entered into a valid and enforceable agreement with Hankook that governed Innovation's status as an Authorized Seller.

213. Hankook's ONE Dealer Contract with Innovation prohibited Innovation from selling Hankook products to any third parties, such as Monza and Hajjar, who are not end-user consumers and who intend to resell the products, like Monza and Hajjar.

214. Innovation breached its ONE Dealer Contract with Hankook by selling Hankook products to Defendants Monza and Hajjar, who resold the products on the Walmart Storefront.

215. Innovation knew that Defendants Monza and Hajjar were not end-user consumers.

216. Innovation knew that Defendants Monza and Hajjar were reselling the Hankook products they purchased from Innovation on the Walmart Storefront.

217. Innovation did not cure these breaches and continued to breach its ONE Dealer Contract with Hankook until Hankook terminated Innovation's Hankook ONE Dealer status.

218. Defendants have committed the independent torts of trademark infringement, false advertising, tortious interference with contract, and breach of contract.

219. As a proximate result of Defendants' actions, Hankook has suffered, and will continue to suffer, immediate and irreparable harm. Hankook has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

220. As a result, Hankook has suffered damages and Hankook is entitled to recover its damages, including, but not limited to, loss of sales for products and a loss of goodwill associated with its trademarks and products.

## SEVENTH CAUSE OF ACTION
**Tortious Interference with Contract Against Defendants Monza and Hajjar**
**Tenn. Code § 47-50-109**

221. Hankook re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

222. This claim arises under the laws of the State of Tennessee.

223. Hankook has valid contracts and business relationships with its Hankook ONE Dealers, who sell Hankook products to end-user consumers.

224. Defendants Monza and Hajjar (the "Interfering Defendants") are not, and have never been, Hankook ONE Dealers.

225. The Interfering Defendants are not, and have never been, Hankook ONE Dealers.

226. Upon information and belief, the Interfering Defendants had knowledge of Hankook's contracts with its Hankook ONE Dealers.

227. Interfering Defendants, acting with malice, interfered with the contracts between Hankook and its Hankook ONE Dealers by purchasing products from Hankook ONE Dealers for the purpose of reselling those products on the Internet, in violation of the Hankook ONE Dealers' contracts with Hankook. Defendant thereby induced breaches of the contractual relationship between Hankook and its Hankook ONE Dealers.

228. The breach of contract between Hankook and its Hankook ONE Dealers was the proximate result of the Interfering Defendants' conduct.

229. The Interfering Defendants' actions caused substantial injury to Hankook including loss of sales and damage to its existing and potential business relations and reputation for which Hankook is entitled to treble damages.

<u>EIGHTH CAUSE OF ACTION</u>
**Common Law Tortious Interference with Contract Against Defendants Monza and Hajjar**

230. Hankook re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

231. This claim arises under the laws of the State of Tennessee.

232. Hankook has valid contracts and business relationships with its Hankook ONE Dealers, who sell Hankook products to end-user consumers. These contracts prohibit Hankook ONE Dealers from selling Hankook products to third parties, such as the Interfering Defendants, who are not end-user consumers.

233. The Interfering Defendants are not, and have never been, Hankook ONE Dealers.

234. The Interfering Defendants have sold—and continue to sell—a high volume of products bearing the Hankook Trademarks through their Walmart Storefront.

235. Hankook has not itself sold any Hankook products to the Interfering Defendants.

236.    Defendant Innovation purchased products from Hankook Authorized Distributors when Innovation was a Hankook ONE Dealer.

237.    Based on Hankook's investigation, it is plausible and a reasonable inference that the Interfering Defendants acquired the products they are reselling from Innovation when it was an Authorized ONE Dealer, as well as from one or more of Hankook's Authorized Sellers.

238.    The Interfering Defendants have known since, at the latest, receiving Hankook's November 27, 2024, cease-and-desist letter that Hankook has agreements with its Authorized Sellers that prohibit them from selling Hankook products to third-parties who intend to resell products, and that the Interfering Defendants would tortiously interfere with those agreements if they continued to acquire products from Authorized Sellers for resale.

239.    The Interfering Defendants, despite having knowledge of this prohibition and without legal right, privilege, or justification, have maliciously, intentionally, knowingly, and willfully interfered with the agreements and business relationships between Hankook and its Authorized Sellers, without justification, by purchasing products from Authorized Sellers for the purpose of reselling them on the Internet, thereby causing Authorized Sellers to breach their agreements with Hankook.

240.    In inducing Hankook's Authorized Sellers to breach their agreements with Hankook, the Interfering Defendants acted with improper means and engaged in independently tortious acts.  The Interfering Defendants purchased Hankook products from Authorized Sellers— and in so doing, instigated a breach of Authorized Sellers' agreements with Hankook—so that Defendants could resell Hankook products on the Internet without Hankook's consent and misrepresent their status as "authorized dealer[s]," thereby committing an independent tort.

241.     Upon information and belief, the Interfering Defendants interfered with Hankook's agreements with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with Hankook by selling to these Defendants.

242.     The Interfering Defendants are not parties to the agreements they caused Authorized Sellers to breach.

243.     The Interfering Defendants have also known since at least October 1, 2022, when Innovation became a Hankook ONE Dealer, that Hankook's contracts with its Hankook ONE Dealers prohibit them from selling Hankook products to non-end users who intend to resell products.

244.     The Interfering Defendants, despite having knowledge of this prohibition and without legal right, privilege, or justification, have intentionally interfered with, at minimum, the ONE Dealer Contract between Hankook and Innovation.

245.     Upon information and belief, the Interfering Defendants interfered with Hankook's contracts through wrongful means.  Specifically, Defendants acted jointly and in concert to create a scheme for purchasing high volumes of Hankook products from at minimum, at least one Hankook ONE Dealer, and reselling them on the Internet in ways that allowed them to avoid detection by Hankook.  Based on Hankook's investigations, Hajjar formed Innovation and Monza as sham companies so that Innovation could become a Hankook ONE Dealer, purchase Hankook products, and sell or transfer those products to Monza, which was formed solely to resell those products on the Internet.

246. The Interfering Defendants are not parties to the contracts they caused Hankook ONE Dealers to breach.

247. The Interfering Defendants have no legal right, privilege, or justification for their conduct.

248. The Interfering Defendants' actions have caused Hankook to suffer, and continue to suffer, substantial injury including loss of sales and damage to its existing and potential business relations.

249. The injury to Hankook is immediate and irreparable, as Hankook's reputation and relationships have been damaged among its consumers, Hankook ONE Dealers, and Authorized Sellers.

250. The acts of the Interfering Defendants were willful, malicious, oppressive, and undertaken with the conscious intent to deprive Hankook of its rights and property, thereby entitling Hankook to exemplary damages in addition to all other damages sustained thereby.

## NINTH CAUSE OF ACTION
### Breach of Contract against Defendant Innovation

251. Hankook re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

252. Innovation entered into a valid and enforceable agreement with Hankook that governed Innovation's status as an Authorized Seller.

253. Thereafter, Innovation entered into a valid and enforceable ONE Dealer Contract with Hankook that governed Innovation's status as a Hankook ONE Dealer.

254. Innovation's ONE Dealer Contract with Hankook incorporated by reference Innovation's prior agreement with Hankook, and required Innovation to abide by both the Hankook Terms and the ONE Dealer Contract.

255.    Hankook's ONE Dealer Contract with Innovation also prohibited Innovation from selling Hankook products to any third parties, such as Monza and Hajjar, who are not end-user consumers and who intend to resell the products, like Monza and Hajjar.

256.    Hankook's ONE Dealer Contract with Innovation also prohibited Innovation from selling Hankook products on any website or online marketplace, including the Walmart Storefront, without prior authorization from Hankook.

257.    Hankook never authorized Innovation or any of the other Defendants to sell Hankook products on the Walmart Storefront.

258.    Hankook has performed all of its obligations under the ONE Dealer Contract.

259.    Innovation breached its ONE Dealer Contract with Hankook by selling Hankook products through the Walmart Storefront without authorization from Hankook.

260.    Innovation breached its ONE Dealer Contract with Hankook by selling Hankook products to Defendants Monza and Hajjar, who resold the products on the Walmart Storefront.

261.    Innovation knew that Defendants Monza and Hajjar were not end-user consumers.

262.    Innovation knew that Defendants Monza and Hajjar were reselling the Hankook products they purchased from Innovation on the Walmart Storefront.

263.    Innovation did not cure these breaches and continued to breach its ONE Dealer Contract with Hankook until Hankook terminated Innovation's Hankook ONE Dealer status.

264.    Innovation has no legal excuse for failing to perform its obligations under the ONE Dealer Contract.

265.    As a proximate result of Innovation's breaches of the ONE Dealer Contract, Hankook has suffered damages, including loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

# PRAYER FOR RELIEF

WHEREFORE, Hankook prays for relief and judgment as follows:

A.     Judgment in favor of Hankook and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.     That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)     Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Hankook products,

ii)     Prohibiting the Enjoined Parties from using any of the Hankook Trademarks in any manner, including advertising on the Internet,

iii)     Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Hankook products as well as any products bearing any of the Hankook Trademarks,

iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Hankook Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and

any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

v) Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Hankook's products, or any of the Hankook Trademarks,

vi) Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Hankook Trademarks which associate Hankook's products or the Hankook Trademarks with the Enjoined Parties or the Enjoined Parties' website, and

vii) Requiring the Enjoined Parties to take all action to remove the Hankook Trademarks from the Internet, including from the website www.walmart.com;

C. An award of attorneys' fees, costs, and expenses; and

D. Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal rules of Civil Procedure, Hankook demands a trial by jury on all issues so triable.

Dated: May 20, 2025                    Respectfully submitted,

*/s/ Elizabeth O. Gonser*
Elizabeth O. Gonser (TN No. 26329)
Grace C. Peck (TN No. 38558)
Riley & Jacobson PLC
1906 West End Avenue
Nashville, TN 37203
Tel: 615-320-3738
egonser@rjfirm.com
gpeck@rjfirm.com

*Attorneys for Plaintiff Hankook Tire America*
*Corporation*